DAVID GELSTON and PETER A. SCHENCK, *Plaintiffs in error,*

against

GOULD HOYT, *Defendant in error.*

IN ERROR, to the supreme court on a bill of exceptions, in which were set forth the pleadings and demurrer, that judgment was given for the plaintiff below upon the demurrer, and the proceedings at the trial, where a verdict was found for the plaintiff for 107,369 dollars and 43 cents damages. The proceedings of the court below, after the trial, upon the bill of exceptions, were not stated.

The declaration, which was in trespass, contained five counts: 1. That the defendants below, on the 10th of *July*, 1810, took, and carried away, the goods and chattels of the plaintiff, of the value of 200,000 dollars. 2. That the defendants, on the same day, took, and carried away, a vessel of the plaintiff, called the *American Eagle*, together with her tackle, apparel, and furniture, 500 tons of stone ballast, 100 hogsheads of water, 130 barrels salted provisions, 20 hogsheads of ship bread, of the value of 200,000 dollars. 3. For carrying away the vessel, &c. as in the last count, and damaging, spoiling, and converting and disposing thereof, to their own use. 4. For taking and seizing a certain vessel of the plaintiff, of the value of 200,000 dollars, in which the plaintiff intended, and was about to carry, and convey, certain goods and merchandizes, for certain freight and reward, to be paid to him, and keeping and detaining the same for a long space of time, and converting and disposing thereof, to their own use, whereby he was prevented from conveying the

*Where the plaintiff in the supreme court demurrs to the defendant's pleas, who joins in demurrer, and the cause being called on, the defendant's counsel declines arguing the demurrer, and judgment is, of course, given for the plaintiff, the defendant cannot, on bringing a writ of error, object to the propriety of the judgment which had thus passed against him by default.*

*No point can be raised in a court of appellate jurisdiction, which was not argued in the court below.*

*The actual and peaceable possession of a chattel, is sufficient to maintain an action of trespass.*

*An admission of the counsel of the plaintiff on the trial of an action of trespass, that the defendant acted without malice, precludes the plaintiff from claiming vindictive*

damages; and, therefore, evidence on the part of the defendant, in the nature of a justification of the act, is inadmissible by way of mitigation of damages.

An officer of the revenue seizing goods, as forfeited, and causing them to be libelled and tried, in an action of trespass, by the owner, can only plead a condemnation. or an acquittal, with certificate of probable cause.

The judgment or decree of a court of competent jurisdiction, binds only parties or privies.

Where a vessel is seized as forfeited, by the surveyor of a port, under orders from the collector, and is libelled in the district court, the surveyor and collector are privies; as it is to be presumed, nothing appearing to the contrary, that the seizure was made in consequence of information given by them to the government; and they are bound by the decree of the district court. But if they are not informers, yet they are privies, by virtue of their office, and act of seizure

A decree against the principal binds the agent, who must look to the principal for indemnity.

A sentence of restitution in the district court of the *United States*, of a vessel which had been seized by revenue officers, is conclusive evidence, in an action of trespass, brought by the owner against the officers, that the seizure was illegal.

A decree, in proceedings *in rem*, of a court of peculiar and exclusive jurisdiction, whether of condemnation or acquittal, is binding upon all persons.

It is not for courts of law to determine whether a revolted colony has become an independent state, but for the government alone, and until the government has solemnly recognised its existence as a nation, courts are bound to consider the ancient state of things as remaining.

The ports of the island of *St. Domingo* respectively under the government of *Pelton* and *Christophe*, are not independent states within the meaning of the act of congress, of the 5th of *June*, 1794.

Where a writ of error is brought on a judgment for the plaintiff in an action for a tort, and the judgment is affirmed, the defendant in error will not be allowed interest on the judgment.

IN ERROR.
......
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

said goods, and lost the profit which would have accrued therefrom. 5. For seizing and taking, possession of divers goods and chattels of the plaintiff, that is to say, a ship called the *American Eagle*, together with, &c., (as in the second count,) and continuing in the possession of the said goods and chattels, and taking and carrying them away. The defendants below pleaded the general issue, and two special pleas in bar, alleging the goods, &c. mentioned in the several counts of the declaration, to be the same, and justifying the trespass; for which, together with the proceedings on the trial in the court below, see *ante*, pp. 141—144.

On the cause coming on to be argued in this court, the reasons for the judgment of the court below were assigned by Mr. *Justice* SPENCER. (See *ante*, p. 150—156—7.)

*H. Bleecker*, for the plaintiffs in error. In discussing this case, I shall consider, in the first place, the correctness of the judgment given by the supreme court on the demurrer to the second and third pleas of the defendants below, and shall then proceed to the examination of the questions arising on the bill of exceptions.

The supreme court erred in the judgment which they gave on the demurrer to the second plea. That plea is good; it states that the vessel was to be employed in the service of *Petion*, one foreign power, against *Christophe*, another foreign power, then at peace with the *United States*; and this was sufficient; it was unnecessary for us to allege that *Christophe* and *Petion* were independent states. The act of congress* speaks merely of foreign princes and states; and whether one or both be independent or not, is no ingredient of the offence; that *Petion* and *Christophe* were foreign princes and states, the plaintiff below admitted by his demurrer; if he intended to avoid the consequences of such an admission, his proper course would have been to have replied, denying that they were foreign states recognised by this government, which would have imposed upon us the necessity of proving them such; and we were not bound to set forth the history of *St. Domingo* in our plea. But, as the pleadings now stand, our justification is sufficient, and we are entitled to judgment upon this plea. It may be said, that it contains double matter, to wit, the *instructions of the president;* on that we do not rely as a justification; but if the plaintiff be-

* Act June 5th, 1794, s. 3.

low intended to except, on the ground of duplicity, he should
have demurred specially. The third plea must, also, be good,
upon this demurrer; the same answer is given to the objection
of duplicity in this plea as in the last. If the state, or prince,
be imperfectly described, it is matter of form only, and the
plaintiff below should have demurred specially on that account.
It is, at least, a good title defectively set forth, and the pleading
is sufficient in substance; the facts of it are confessed by the de-
murrer.*

Next, as to the *bills of exceptions.* The plaintiff below did
not show a sufficient possession of the vessel to enable him to
maintain this action; he was a mere bailee, not answerable
to the owner, whoever he was,† and the acquittal in the district
court, which decided nothing as to title, gave him no other or
better title than he had before. The motion for a nonsuit,
therefore, ought not to have been overruled.

The evidence offered by the defendants below ought to have
been received, and the supreme court erred in deciding that all
defence was precluded by the decision of the district court.

A judgment, or decree, is binding only upon parties or privies.
The plaintiffs in error were not parties to the proceedings in the
district court; for those proceedings were not carried on in their
names, nor were they interested therein in any way; hence the
injustice of their being precluded by a decision which they had
no opportunity to controvert. The proceedings in the district
court were instituted against the vessel, in the name, and on the
behalf of the United States. The plaintiffs in error were merely
agents authorized by the government to seize the vessel, and
after seizure, their power and interest ceased, and passed into
the hands of the district attorney, who was the authorized agent
to prosecute;‡ and ought they to be punished for the default of
the district attorney in not making out the forfeiture?

It will be said that this was a decree *in rem*, and, therefore,
binding upon all the world; but proceedings *in rem* can only
have that effect (if in any case) when they terminate in a con-
demnation; an acquittal of the property is not conclusive.§ A
decree of an ecclesiastical court against a marriage is not *res
judicata;* and there, every person who is interested can make
himself a party while the cause is pending, and before it is conclu-
ded.|| With us, a decree *in rem* is not invested with that bind-
ing efficacy contended for on the other side; the subject is

IN ERROR.

ALBANY,
February, 1816.

GELSTON
v.
HOYT.

* 2 H. Bl. Rep.
261. Tidd's Pr.
647, 648, 649.
Com. Dig. Plead-
er, (Q. 7.)

† Bac. Abr.
Trespass, (C. 2.)

‡ 3 L. U. S. 279.
1 L. U. S. 74. 1
Grayd. Dig. 196.
251.

§ Peake's Ev. 29.
Bull. N. P. 244.
5 Term Rep. 255.

|| 2 Wils. 124.
Harg. Tracts,
470. 4 Co. 29. &

IN ERROR.
·····
ALBANY,
February, 1816.

GELSTON
v.
HOYT

* 2 Johns. Cas.
451. S C. 2
Caines' Cas. 217.

† Peake's Ev 26.
Gilb.  Ev.  22.
Bull. N. P 232.

‡ Ambl. 756. 1
State Trials. 217.
219.  Ld. Thur-
low's Argument,
Runing.  Eject.
364.
§ 1 Lev. 235.
‖ W. Black. Rep.
977.

always open to examination : such was the doctrine of this court when it decided that the decree of a foreign prize court, condemning a vessel as belligerent property, was but *prima fa-cie* evidence of a breach of the warranty of neutrality, in an action between insurer and insured.* This decision places us upon open and elevated ground ; it relieves us from the necessity of sheltering ourselves under the distinction taken in the *English* books between sentences of acquittal and condemnation : it shows that no decree whatever can operate upon the rights of strangers. And why should the sentence of the district court be an exception to the general rule ? That court is no more competent to decide on the legality of a seizure than the supreme court. A judgment in a criminal case is not evidence in a civil action, because it is *res inter alios acta*. The judgments of foreign courts, or of the courts of other states, may be re-examined in actions here, between the same parties ; and the district court, as regards us, is not a domestic court, for it is the court of another government. A decision of this court, or of the supreme court, is not binding upon persons not parties or privies to it ; it is not *res judicata* in an action between strangers ;† and he who cannot come in as a party to the proceedings, and defend, or enter an appeal from the decision, is a stranger.‡ In an action by an executrix, it was held that the defendant was estopped by the probate from proving the will forged ; and why ? Because he might have appealed from the decision of the ordinary.§ The case of *Scott* v. *Shearman*,‖ relied upon by the court below, is inapplicable ; there a *condemnation* in the exchequer was held conclusive ; in our case there was an *acquittal* ; but it has been sufficiently shown, that whether the property were acquitted or condemned, the sentence would be equally inconclusive, as well because proceedings *in rem* have not, in fact, the uncontrolable power attributed to them, as because the plaintiffs in error cannot be bound by proceedings to which they were not parties ; in which they could not have interposed nor asserted a claim, and from which they could have prosecuted no appeal.

Next, we contend, that the facts offered to be proved by the defendant below, had they been admitted, were sufficient to establish his defence ; and in this point are involved the real merits of the case.

*Petion* and *Christophe* were princes and states, within the

meaning and policy of the act of congress, which was never
intended to be confined to *legitimate* princes. They are princes
and states *de facto ;* they and their predecessors have existed as
such, ever since the year 1791 ; they have asserted and pos-
sessed all the rights of sovereignty, and have exercised, with-
out control, and, at length, without opposition, the power of
self-government   The dominion of either of them is, in the
words of the definition which *Vattel* gives of a nation or state,[*]
" a body politic, or a society of men united together to promote
their mutual safety and advantage by means of their union."
Such a union, according to that writer, constitutes a state.  A
public authority, or, in other words, a sovereignty, subsists
among them, " to order and direct what ought to be done by
each member, in relation to the end of the association ;" to this
sovereignty every member is subjected, " in every thing that re-
lates to the common welfare." The public authority or sove-
reignty " especially belongs to the body politic, or the state ;[†]"
wherever that authority is found, there is a nation, or state :
the two ideas of sovereign power and national existence are
coextensive and inseparable; they are convertible terms.   *Pe-
tion* and *Christophe,* or the governments of which they are re-
spectively the heads, exercise the sovereignty according to
their respective constitutions.  How, then, can it be said that
these sovereignties are not bodies politic, or states ?

When the plaintiffs in error have shown that *Petion* and
*Christophe,* or the governments of which they are the heads,
assuming and exercising, as they do, all the rights of sovereign-
ty, are foreign princes and states, they have made out a com-
plete and perfect justification, and bring themselves within the
letter of the act of congress.  The same question arises here,
as on the demurrer to our second plea ; and if it were not ne-
cessary for us, in pleading our justification, to allege, that they
were independent, neither was it necessary in making out our
defence by evidence.  But, we are not unwilling to meet the
subject in the point of view which is deemed by the adverse
party the most favourable to themselves.

A recognition by one state, of the superiority of another, does
not destroy the independence of the former.  One state may do
homage to another as its feudal superior, or may pay tribute to
a foreign power ; but the homage, or tribute, merely diminishes
its dignity, and still suffers its independence to remain entire.[‡]

IN ERROR.
......
ALBANY,
February. 1816.
GELSTON
v.
HOYT.

* B. 1. c. 1 s. 1.

† Id. s. 2.

‡ Id. s. 7, 8.

IN ERROR.
......
ALBANY,
February, 1816.
~~~~~~~~~
GELSTON
v.
HOYT.

But the governments of *St. Domingo* have not, in the slightest degree, acknowledged themselves to be dependent on the crown of *France.* They have asserted, and maintained their independence; and whatever claim of supremacy the government of *France* may have made, it has never been able, effectually, to enforce it, and the revolted colonies have uniformly resisted it. The mere circumstance of their revolting, and going to war with their former sovereign, renders them an independent nation. " A civil war," says *Vattel,*\* " breaks the bands of society and government, or, at least, it suspends their force and effect; it produces, in the nation, two independent parties, considering each other as enemies, and acknowledging no common judge; therefore, of necessity, these two parties must, at least, for a time, be considered as forming two separate bodies, two distinct people. Though one of them may be in the wrong in breaking the continuity of the state, to rise up against lawful authority, they are not the less divided in fact. Besides, who shall judge them? who shall pronounce on which side the right or the wrong lies? On earth, they have no common superior. Thus, they are in the case of two nations who, having a dispute, which they cannot adjust, are compelled to decide it by force of arms." The laws and usages of war, as recognised by civilized nations, must be practised by them towards one another. " When a nation becomes divided into two parties," says the same author,† " absolutely independent, and no longer acknowledging a common superior, the state is dissolved, and the war between the two parties is the same, in every respect, as a public war between two different nations." Speaking of the conduct which foreign nations are to pursue, in regard to the contending parties, *Vattel*‡ observes, " It is not for them to judge between contending citizens, nor between the prince and his subjects; to them the two parties are equally foreigners, equally independent of their authority." The law of nations, then, evidenced as it is by the deliberate opinion of one of the most authoritative writers upon that branch of jurisprudence, has decided the question in our favour; and to that decision this court is bound to conform its judgment; for " the law of nations (wherever any question arises which is properly the object of its jurisdiction) is here adopted in its full extent by the common law, and is held to be a part of the law of the land."§ *Martens*‖ speaks expressly to the same effect. He puts this ques-

\* *B. 3. c. 18. s. 293.*

† *Id. s. 295.*

‡ *Id. s. 296.*

§ *4 Bl. Com. 67.*

‖ *Law of Nations, 80, 81.*

IN ERROR.
........
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

tion: what is the conduct to be observed by a foreign power when " a province, or territory, subjected to another state, refuses obedience to it, and endeavours to render itself independent ?" His answer is, " A foreign nation, not under any obligation to interfere, does not appear to violate its perfect obligations, nor to deviate from the principles of neutrality, if (in adhering to the possession without examining into its legality) it treats as sovereign him who is actually on the throne, and as an independent nation, people who have declared, and still maintain themselves independent." If the government of the *United States* has, in any manner, or in any one instance, recognised the governments of *St. Domingo* as foreign states, it is sufficient for our defence.* The record admitted such a recognition, when the defendant in error demurred to a plea justifying the seizure under the orders of the government of the *United States.* The giving such orders was an implied admission, by the executive, of that fact.

But if the evidence offered by us, at the trial, was not a sufficient defence, still it was admissible in mitigation of damages. The damages given by the jury were enormous, and treble the valuation which the plaintiff himself put upon the vessel, (by which he ought to be concluded,) when he had her appraised at 35,000 dollars.

The record of the judgment of the court below is not made up according to the established forms of law. The bill of exceptions is inserted in the body of the record, and there is no other *postea*, or statement of the proceedings at the sittings, where the cause was tried, than such as is contained in the bill of exceptions.

*Van Buren* (Attorney-General) and *T. A. Emmet*, contra. The plaintiffs in error did not choose to argue the demurrer in the court below, and, therefore, they ought to be precluded from raising any question upon it in this court; for, if such a course be sanctioned, it would have the effect of depriving the plaintiff below of the benefit of the permission which the supreme court would have granted him, to withdraw his demurrer and reply.

But the second and third pleas are palpably bad; the defendants below have not averred themselves to be revenue officers, and so have shown no right to make the seizure. The directions of the president can be no justification; for the government

* *Edw. Adm. Rep.* 1.

IN ERROR.
.......
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

must act by judicial process, unless where a particular power is given by statute. The 7th section of the act, under which the seizure in this case was alleged to have been made, gives the president power, " in every case in which a vessel shall be fitted out and armed, or attempted so to be fitted out or armed," contrary to the provisions of that act; "to employ such part of the land or naval forces of the *United States*, or the militia thereof, as shall be judged necessary for the purpose of taking possession of, and detaining, any such ship or vessel." The present case has not been brought within that section; the defendants below have not averred that any land or naval force was employed. The power there given is a limited power, and should be specially stated.* These pleas are also bad, because they do not answer the whole of the declaration ; they do not meet the charge of *converting and disposing to the defendants' use*, and they have thus rendered themselves trespassers *ab initio* ; for, by converting the vessel to their own use, although the original taking might have been lawful, they become trespassers *ab initio*.†

These pleas, too, are substantially bad, in presenting a fact which cannot be tried by a jury. What is, or is not, a foreign state, is a question of public law for the decision of the court, and to be determined by the solemn acts and recognitions of the government.‡ The fact, then, that *Petion* and *Christophe* were states, is not admitted by the demurrer, for it is a matter of law ; and a demurrer admits only such facts as are triable by a jury. The plaintiffs in error come with a very ill grace to assert the independence of the island of *Hayti*, when, in 1809, two libels were depending, on their own prosecution, in the district court of this district, against goods alleged to be of the "growth, produce, and manufacture of a colony, or dependency of *France*, to wit, *St. Domingo*," and seized, as imported, or intended to be imported, into the *United States*, in contravention of the act of congress, for prohibiting commercial intercourse between the *United States*, and *Great Britian* and *France*.§ We repeat, that a demurrer admits only facts well pleaded, which are thereby withdrawn from the jury ; but it admits no matter of judicial cognizance.‖

The third plea is bad, because too general and vague, in not setting forth the foreign states, in the service of one of which

* 1 Esp. Dig. 395.

† Com. Dig. Trespass, (C. 2.) Distress, (D. 6.) 8 Co. 146. 2 Rol. Abr. 561. l. 10. 562. l. 15. 20. 25. 3 Wils. 20. 1 Crm Rep. 12.

‡ Edm. Adm. Rep. 1. 4 Cranch, 272.

§ The Case of the British schooner James, and of the Swedish schooner Lynx. In both cases the forfeitures were remitted by the secretary of the treasury

‖ 1 Saund. 49. March. pl. 420. Lutw 16. Lutw. 421, 422. 2 Leon. 34. 3 Leon. 3. 1 Show. 6. Poph. 209. Sav. 88. 2 Ro. 22. 1 Leon. 80.

the vessel was to be employed against the other.   The justifica- IN ERROR.
tion of the defendants consisted in a criminal charge against
the plaintiff below ; the utmost certainty, therefore, is required ALBANY,
February, 1816.
in stating it; but to this allegation it would be impossible for
the plaintiff to know what to reply.*

The defendants below had but two pleas in bar of our action ;
they might have pleaded that the vessel had been condemned as
forfeited, or that she had been acquitted, and a certificate of
probable cause granted them by the judge.   But, by their pre-
sent pleas, they have attempted to draw to the jurisdiction of
the state courts, a cause of which they can have no cognizance.
In *England,* in an action of dower, on a plea of *ne unques ac-
couple,* the question of *loyal matrimonie,* if contracted within the
kingdom, is always sent to be tried by the bishop, in whose
diocese the espousals are alleged to have been had ;† and thus,
in this, and a variety of other cases, the courts of law take par-
ticular care not to intrench upon courts of special jurisdiction.
In an action of trespass, *de bonis asportatis,* brought while a suit
is depending for the forfeiture, the defendant may plead the
pendency of the proceedings in the district court, in abate-
ment.‡

[During the argument *Baldwin,* for the plaintiffs in error,
observed, that the first count was bad, the verdict being gene-
ral, for not specifying what goods and chattels; and that the
fourth count was equally bad for the same cause, though not so
palpably.]

It is in vain that the counsel, on the opposite side, endeavour
to avoid the effect of their own mispleading, by fixing the first
error upon the plaintiff.   These objections to the declaration
were not made in the court below, nor assigned for error, and it
is too late to start them here.   But these counts, if informal,
are cured by the defendant's pleas in bar, which identify the
goods, and show what the cargo consisted of.§   If not aided by
the bar, they are cured by the verdict, and, at the utmost, set
forth a good title in a defective manner, and the circumstances
omitted must have been proved on the trial, to have entitled the
plaintiffs to a verdict.‖   It is only insufficient pleading, and
that is within the statute of jeofails.   The defendants below
ought to have taken advantage of the error, in arrest of judg-
ment, and the court below would have allowed us to have ap-
plied our verdict to the good counts ;** and this court will al-

* Str. 909. Burr.
Rep. 2451. Com.
Dig. Pleader, (C.
76.)   2  Saund.
379. 3 Term Rep.
636.

+2 H. Bl. Rep.
145.

‡ 5 Johns. Rep.
101.

§ Com. Dig. Plea-
der. (C. 85 ) Cro.
Car. 365.  Lutw.
1492.   Post. 377.
Lutch. 487.  Dy-
er, 15. pl 78.

‖ 1 Johns Rep.
462.   2  Johns.
Rep. 551   5 Co.
34.  2 Saund.74.
n.  1  Cro. Jac.
435.  Com. Dig.
Pleader, (C. 67.)
Cro. Eliz. 276.
** 2 Johns. Cas.
17.  1 Johns Rep.
505.  Doug. 376.
3 Term Rep. 659.

IN ERROR.
••••••
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

* 4 Johns. Rep.
499    7 Johns.
Rep. 468

† 4 Term-Rep.
489.    6 Johns.
Rep 195. 8Johns.
Rep   432.    2
Saund   47.   1
Chitty's Pl 168.
171.  2 Ro. Abr.
551. 1  31  569.
1.  22.    Broo².
Trespass, 67.

low the amendment to be made, in the same manner as may be done in the court below.* There can be no difficulty, in this case, in making the amendment, for all the facts are set forth in the bill of exceptions, and make part of the record. It is denied that one bad count will vitiate a general verdict.

To proceed to the consideration of the bill of exceptions. The application for nonsuit was properly overruled at the trial; sufficient evidence of property had been given; it was enough that we had the possession in order to maintain an action of tresspass.† The plaintiff afterwards proved the sale and delivery of the ship to himself, and thus established his right of property.

The main point in this case is, the effect of the decision of the district court, which we contend is conclusive. For it would be monstrous that the acquittal should be conclusive on the district court, which has exclusive jurisdiction of the subject matter, and yet not binding, in a collateral action, on a court which has no jurisdiction of it at all. The decision of every court of exclusive jurisdiction is binding upon all others. The court of chancery has exclusive power to decree a divorce. If, then, a woman brings a personal action at law, in her own name, and the defendant pleads the coverture of the plaintiff, who replies the divorce, the proceedings and decree of the court of chancery, are complete and perfect evidence, in support of the replication, and they cannot be opened and examined by the court of law. So, the decision of the court of probates upon a will of chattels, is conclusive. In like manner, the district court has exclusive jurisdiction in cases of forfeitures under the laws of the United States, which is final, unless appealed from; and even had our courts concurrent jurisdiction, still the decree of that court must be final. On a former occasion, in this very cause, the defendants' counsel, (Baldwin,) on moving the supreme court for an imparlance, until the libel in the district court was determined, admitted this very position; and urged, as a reason for granting the rule, that if the supreme court could entertain this cause, and suffer it to proceed, it would, in effect, have a control on the district court of the United States, " which has exclusive jurisdiction in all such cases."‡

‡ 3 Johns. Rep.
180.

Again; every judgment not reversed is binding upon parties and privies. In suits in rem, in the admiralty, every person is deemed a party. Every person having a qualified interest, can

interpose his claim; and the plaintiffs in error were, strictly and peculiarly, privies to the proceedings in the district court, and although they might not be permitted to appeal, yet, as privies, they were bound by them. That they were privies, there can be no doubt; they made the seizure as agents of the government of the *United States*; as officers of the revenue, they were the lawful agents particularly designated for that purpose. That they were informers, there can be no doubt; that is to be inferred from the libel and proceedings thereon; the libel states, that *Schenck* made the seizure; and why was the seizure made ? Because, as informers, they were entitled to a moiety of the forfeiture. But, admitting that the plaintiffs in error were neither parties nor privies to the decree of the district court, still, as it was a decree *in rem*, they are bound by it. A decision *in rem*, in a court of record of competent, and, especially, of exclusive jurisdiction, is binding upon strangers.* The court which made the decision is bound by it; still more are other courts and strangers.

The distinction attempted to be taken on the other side, between sentences of condemnation and of acquittal, has no existence; it is repelled by the authorities which we cite.† Such a distinction would act oppressively and unjustly upon the party whose property had been seized. He might continually be harrassed with new seizures and prosecutions. If a sentence of acquittal be not conclusive, why does the statute authorize the judge to give a certificate of probable cause? There would be no necessity for vesting this enormous power in the hands of a single judge, if the circumstances which would render the granting the certificate proper might be adduced as a defence in another court, in a collateral action for the trespass. It is only in criminal cases that the distinction between a condemnation and an acquittal subsists; never in civil cases. In a criminal case the acquittal ascertains no fact, and is not even conclusive upon the court which pronounces it.‡ The doctrine in the case of the *Dutchess of Kingston* applies only to criminal prosecutions.

Nor have the cases, in relation to the sentences of foreign prize courts, any application here. Those decisions we cannot, and ought not, attempt to shake; but the district court is not a foreign court; it is a court established under the authority of the constitution of the United States, which is the supreme law of the land.

GELSTON
v.
HOYT.

* W. Bl. Rep. 977. Ambl. 756. Peake's Ev. 78. 79 Harg Law Tracts, 451. Bull N P 244, 245. 2 Wils. 124. 128. 5 TermRep. 256. Brook's Abr. Estoppel, pl. 2. Fitzh. Abr. Estoppel pl. 28. † 12 Vin. Abr. 94. 5 Term Rep. 255.

‡ Running. Eject. 364. 2 Wils. 124. 128. Bull. N. P. 245.

IN ERROR.
........
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

Admitting that this court is authorized to open and re-examine the decision of the district court, and treat the case as if it were not a *res judicata*, still, the plaintiffs in error must fail. It is for government alone to decide whether the states of *Hayti* are independent, within the meaning of the act of congress; certainly not for a jury. The recognition of a revolted and rebellious colony, as a nation, is a matter of high expediency, of public policy, connected with the law of nations, and of which courts and juries are incompetent to judge. Considerations of foreign intercourse, of peace and war, are involved, and if courts usurp the power of deciding such questions, they may involve the country in hostilities. Suppose a vessel had been fitted out in the ports of the *United States* by *Bonaparte*, to suppress the insurrection in *Hayti*, and had been seized under this act, would it not have been a just cause of complaint on the part of *France?* It would be usurpation on the executive and legislative functions for courts of justice to consider a nation, or a prince, as independent before government has recognised their independence by some law or treaty, or other public formal act. These are the true and only legal evidence of a recognition by the government of the *United States* of a new created foreign power.* It is absurd to say, that the order of the president to seize, mentioned in the pleadings, was such a recognition.; if it were to be so, it should previously have been made known, otherwise we should be punished by an *ex post facto* law; but it does not appear, from the bill of exceptions, that any order was offered to be given in evidence. The effect of such an order was discussed while examining the pleas of the defendant below.

* 4 *Cranch*, 272. *Edw. Adm. Rep.* 1.

The views, however, of the government have been disclosed; their intention has been declared to be, that they would not come in collision with any claims of *France* to the sovereignty of the revolted colonies in *St. Domingo*. By the act of February 28, 1806,† " all commercial intercourse between any person, or persons, resident within the *United States*, and any person, or persons, resident within any part of the island of *St. Domingo*, not in possession, or under the acknowledged government of *France*, shall be, and is prohibited." This was only a temporary act, yet it serves as an exposition of the policy of our government, which courts are bound not to counteract. Courts, both in *Great Britain* and in this country, have decided, that those colonies were not independent nations.

† 8 *L. U. S.* 11.

‡ 4 *Cranch*, 272. *Edw. Adm. Rep.* 1.

The record was properly made up, and if there be any informality in it, this court will amend and overlook it.*

*Baldwin*, in reply, insisted, that this court was in duty bound to examine the points arising on the demurrer, although he refused to argue them in the supreme court.

The defendant in error might have received the ship at any time, upon giving security for the appraised value : the appraisement was made at 35,000 dollars, and never excepted to, and yet he does not bond the ship. How could she be worth 35,000 dollars in *April*, 1806, and 107,000 dollars a short time before?

[*The Chancellor*. The question of damages cannot be argued here.]

The second plea is good, because *Petion* and *Christophe* are to be regarded here as princes, or states, within the meaning of the act of congress ; and it shows that the plaintiff had no right of action ; for the vessel being seized as forfeited, his property was immediately devested, and he could not maintain an action of trespass ;† at least, not until the property was revested in him by the acquittal. The demurrer admits the allegation in the plea, that *Petion* and *Christophe* were foreign states, to be true.

Nations acquire independence in two ways : 1. By the consent of the parent state. 2. By force. Whether independent or not, is a matter of fact ; a recognition of their independence by the government must also be a matter of fact. Suppose, that *Bonaparte* had relinquished his claim to the island of *Hayti*, would that have been matter of law ? In the case of *Rose* v. *Himely*,‡ so much insisted upon, by the other side, the question of the independence of *Hayti* did not arise, and was not decided in that case. *St. Domingo* was then, at least in part, in the possession of *France* ; but *France* has since evacuated the whole island.

We were not bound to deny the carrying away, and disposing of the property ; it was unnecessary to have stated it in the count, for it was mere matter of aggravation ; if the plaintiff below intended to have taken advantage of it, and rendered the defendants trespassers, *ab initio*, he should have shown the special matter in a new assignment.§ But his proper course was, to have denied the fact that the governments of *Petion* and

IN ERROR.
........
ALBANY,
February, 1816,

GELSTON
v.
HOYT.
* Bull. N. P.
317. 2 Esp Dig.
591. 1 R. L.
319. 1 L. N. Y.
Kent & Radcliff's
Ed. 129. 4
Johns. Rep. 499.

† 5 Term Rep.
112.

‡ 4 Cranch, 241.

§ 3 Term. Rep.
292.

IN ERROR.
........
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

* 1 *Chitty's Pl.* 647.

† 1 *Term Rep.* 743.

‡ 11 *Johns. Rep.* 400.

*Christophe* were independent states, and so have had that matter tried. It is, however, unnecessary for us to defend our pleas; for the first fault in pleading being on their side, we are entitled to judgment.* The third plea is also good, on general demurrer; the plaintiff below should have replied to it, or demurred specially.† That plea was drawn to test the right of the defendants below, under the 7th section of the act, which, although it speaks of employing land and naval forces, yet implies a seizure by civil and pacific means—by means of the revenue officers.

We are not bound by the decision of the district court : we were not privies to it. Privies are persons who, by reason of blood or estate, come into the place of a party to the judgment; such are heirs, executors, and devisees, and they may appeal; but we had no right to appeal, and therefore, are not privies. The mere seizure of the ship gave no right to the forfeiture ;‡ and, in that point of view, we are not privies. We insist, also, that there is a substantial distinction between an acquittal and a condemnation. [Here the counsel examined the cases which have already been cited to this point.] Suppose the plaintiff below had brought his action of trespass to trial, and failed, before the vessel was libelled in the district court, could the plaintiffs in error, or the *United States*, have shown that judgment as proof of the forfeiture ? If not, the parties do not stand upon equal ground. Besides, the courts of the *United States* are not domestic courts. The evidence offered should, then, have been admitted ; because, 1. The decree of the district court was not conclusive ; and, 2. Because the chiefs of *St. Domingo* are independent princes, or states, within the act of congress. And the evidence was admissible in mitigation of damages, although the plaintiff below disclaimed to charge the defendants with malice.

THE CHANCELLOR. The suit in the supreme court between these parties was an action of trespass, in which *Hoyt* declared against *Gelston* and *Schenck*, for seizing, taking, and carrying away his ship, called the *American Eagle*. To this charge the defendants plead, not only the general issue, but two special pleas in bar ; and to these pleas there was a general demurrer and joinder, and judgment for the plaintiff.

On the trial of the general issue *Hoyt* gave in evidence, that,

IN ERROR.
......
ALBANY,
February, 1810.
⁓
GELSTON
v.
HOYT.

at the time of the seizure of the said ship, she was in his actual, full, and peaceable possession; and that, upon being seized, she was libelled in the district court of *New-York*, on a charge of being fitted out, armed, and equipped, with intent to be employed in the service of *Petion*, who had under his government part of the island of *St. Domingo*, against *Christophe*, who had under his government another part of the said island. That, on a trial in the district court, under that charge, the libel was dismissed, and the ship decreed to be restored to *Hoyt*, the claimant.

On this evidence, a motion was made for a nonsuit, and overruled.

The plaintiff, *Hoyt*, afterwards, in the progress of the trial, proved his purchase of the ship of the owner; and the defendants offered in evidence, by way of defence, or in mitigation of damages, under the notice of special matter, subjoined to the general issue. that the ship, with her equipment, was fitted out, and armed at *New-York*, on the 1st of *July*, 1810, to be employed in the service of *Petion*, as aforesaid; and that the defendants, as being, respectively, collector and surveyor of the port of *New-York*, seized the ship. This evidence was overruled as a justification; and as the plaintiff thereupon admitted that the defendants had not been influenced by any malicious motives. and had not acted with any view or design of oppressing, or injuring the plaintiff, it was overruled, also, in mitigation of damages; for, after that admission, the plaintiff could recover only the actual damages sustained; and with that direction the judge left the cause to the jury.

To all these decisions of the judge, at the trial, exceptions were taken, and upon that bill of exceptions the cause was brought into this court.

The first error assigned, on the part of the plaintiffs in error, is, that the matters contained in the 2d and 3d pleas in bar, and which appear upon the record, amounted, in law, to a justification, and that the judgment on the demurrer ought to have been in favour of those pleas. As connected with this point, it is also urged, that the first and fourth counts in the declaration are bad, and the defects fatal, after a general verdict upon the declaration at large.

The judges of the supreme court have not assigned reasons for the judgment which they pronounced on the demurrer; be-

IN ERROR.
......
ALBANY,
February, 1816.
〰〰〰
GELSTON
v.
HOYT.

cause, as was stated by Mr. Justice *Spencer*, in behalf of that court, " when the cause was called, (meaning the issue joined on the demurrer,) the defendant's counsel appeared and declined to argue; whereupon, judgment was given for the plaintiffs, on the defendant's counsel declining the argument."

Are, then, the plaintiffs in error to be permitted to come here and argue the questions arising upon the demurrer, when they declined the argument in the court below? This is an important question, and it meets us in the very threshold of the case.

I am of opinion that they are precluded, and for the following reasons :

1. In the first place, it is an unfair pleading, for it takes from the party demurring an advantage which he would have been entitled to in the supreme court, if the inclination of that court had been against him, of withdrawing his demurrer and replying to the pleas. I presume this court cannot grant such a favour. If it can, the favour would be overloaded with costs. I know of no such precedent. It is not a case of amendment, and not within the ordinary province of a court merely of review. A party acts against good conscience if he will not come forward and disclose his reasons, when called upon by the proper tribunal, but reserves himself for another court, and for the cold, hard purpose of accumulating costs, or of depriving his adversary of the opportunity of correcting his error.

2. This point is within the reason of the decision of this court, at the last session, in the case of *Sands* v. *Hildreth*. (12 *Johns. Rep*. 493.) There the appeal was dismissed because the appellant did not appear in the court of chancery after the cause had been regularly set down for hearing, on due notice, but voluntarily suffered a decree to pass against him by default. That decision was not founded on any new principle, and it equally applies to this case. There is the same rule in the *English* house of lords ; and in *Dean* v. *Abel*, (*Dickens' Rep*. 287.,) an appeal was dismissed without going into the merits, because the party, at the hearing in chancery, had made default, and suffered a decree to be pronounced against him. So, again, in a late case, (2 *Schoale & Lefroy*, 712.,) Lord *Eldon* said it was well known as an established rule, that no point not made in the court below, could be made on appeal to the house of lords.

3. This is a just and wise rule ; for the very theory and constitution of a court of appellate jurisdiction only, is the correc-

tion of errors which a court below may have committed; and a court below cannot be said to have committed an error when their judgment was never called into exercise, and the point of law was never taken into consideration, but was abandoned, by the acquiescence. or default of the party who raised it. To assume the discussion and consideration of a matter of law, which the party would not discuss in the supreme court, and which that court, therefore, did not consider, is to assume, in effect, original jurisdiction. It is impossible to calculate all the mischiefs to which such a course of proceeding would lead. Either party would then be able, in every case, to bring his question of law, as new undiscussed points, before this court. This would, indeed, be leaving the supreme court, with its plenitude of power, to enjoy the *otium cum dignitate* in harmless repose; but this was never the intention of the constitution. That court was created, with all its competence and organs, to be the great trustee, the tutelary guardian of the vast body of the common law. What good motive can a party have who will not argue a law question in the supreme court, but insists on bringing it here to be exclusively discussed? It is according to the genius of our whole judicial establishment, that the court which originally decides a cause, should be subject to review by another court; but on the plan pursued in the present case, this court, though only a court of review, will be the first and the last, originally, and finally, to decide the law. Why should not a party be obliged to obtain the opinion of the supreme court before he comes here? How can he know but that such opinion might have saved him the expense, and us the trouble, of the writ of error? It is certainly as much as we can do well, and I fear more than we can do with despatch, to hear and decide questions of law after they have been maturely considered in the supreme court, and with the assistance of all the light and knowledge which can be imparted to the subject, from the researches of that tribunal.

4. But a still more decisive objection to our taking into consideration a question on demurrer in the court below, and there refused to be argued, is to be drawn from that article in the constitution which provides for the institution of this court. It declares, that " if a cause shall be brought up by writ of error on a question of law on a judgment in the supreme court, the judges of the court shall assign the reasons of such their judgment." In a case, then, in which the opinion of the supreme

IN ERROR.
......
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

court was never required, or taken, no reasons can be assigned, and it is not a case for a writ of error within the purview of the constitution. This court is entitled, as *of right*, in all cases of error, to the aid of those reasons; and if the party will not condescend to ask for the opinion of the supreme court before he comes here, he cannot justly complain if we refuse to hear him. It will be imputable to his own fault or folly; and he ought not to be permitted to deprive the opposite party, and this court also, of the benefit of that investigation which the supreme court is always ready and able to give to every question properly submitted to it.

For these reasons, I have thought it to be my duty to abstain from any consideration of the first point, in the plaintiffs' case, respecting the demurrer to the second and third pleas. The same objection applies to a new point suddenly started in the midst of the argument here, and never heard of in the court below, and which was, that the first and fourth counts in the declaration were bad. If I had chosen to have gone into the discussion, I apprehend I should have no great difficulty; for the defects, if any, in the counts, were supplied, and cured by the pleas in bar, which identified and made certain, the goods mentioned in the first and fourth counts. The matters in the special pleas were the same, in substance, with the matters contained in the notice to the general issue; so that the plaintiffs in error have, in fact, lost nothing by the course they took, as every benefit of the special pleas was reserved to them by the notice, and the evidence offered under it. That evidence involved the whole merits of the case, and to those merits I now proceed.

*Hoyt* was in the actual and peaceable possession of the vessel, when the seizure was made; and there can be no doubt, from that fact, that he was entitled to maintain the action of trespass, and that the motion at the trial for a nonsuit was properly overruled. It would be a waste of time to cite authorities to so plain and well-settled a proposition. The great point is, whether the matter offered in evidence by the defendants ought to have been received. The defendants offered to prove, that the ship was fitted out, and equipped in the port of *New-York*, with intent to be employed in the service of *Petion* against *Christophe*, and that she was seized by the defendants, as collector and surveyor of the customs, under the act of con-

IN ERROR.
........
ALBANY,
February, 1818.

GELSTON
v.
HOYT.

gress. When this evidence was offered, the plaintiff had already proved that the seizure was made by *Schenck*, under the directions of *Gelston*, and had given in evidence the proceedings in the district court, in pursuance of that seizure, and under the very allegations set up by the defendants, and from which it appeared, that the district court had, notwithstanding, dismissed the libel and restored the vessel, with the strong opinion that there was not even reasonable cause for the seizure.

The evidence offered by the defendants below was not admissible in mitigation of damages. After the plaintiff had renounced all claim to *extra* damages, and after the judge had ruled that he was only entitled to his actual damages, the testimony, in that view, became wholly useless; for, if entitled to recover any thing, the plaintiff was; finally, entitled to recover the actual damages he had sustained, and we are bound to presume upon the record before us, that he recovered no more. The testimony, *if proper in any sense, was a complete bar to* the action.

But I am of opinion that it was properly overruled; for after the decree of acquittal in the district court, the same question could not be tried again in the action of trespass; and the decision, that the vessel was not liable to seizure and forfeiture under the charge alleged, was binding and conclusive in the action between these parties. The officer who seizes goods on the ground of forfeiture, and causes them to be libelled and tried, has but two pleas in bar to an action by the owner; these are the judgment of the court, if the goods be condemned, and a certificate of probable cause, if the goods be acquitted. If he can show neither, he must answer for the seizure in an action at common law.

This point was discussed at large upon the argument, and with much talent and research. I feel myself, therefore, called on to give it a more particular attention.

It may be admitted as a general principle, that the sentence of a competent court, binds only parties and privies, and does not bind strangers who have no interest in the suit, and who could not be admitted to agitate the case, nor to bring an appeal. Lord Ch. J. *De Grey*, in delivering the opinion of the judges, on the trial of the *Dutchess of Kingston*, stated this general rule. but he said there were some exceptions to it, founded on particular reasons. It does not appear to me, however,

that the defendants below come within the reason of the rule; and it seems to be perfectly just, that the acquittal of the ship, in the district court, on the charge of being equipped for the service of *Petion*, should, as to that charge, be binding and conclusive in the trespass suit.

I do not consider those defendants as strangers to the prosecution in the district court. In the first place, it is to be inferred from the case, that they were the persons who " gave information of the offence," and, consequently, were the persons entitled to one half of the proceeds of the seizure and forfeiture. The statute, under which the seizure was made, gives a moiety to the informer. And who, are we to presume, gave the information, in this case, to the government, and caused the prosecution to be instituted? Whom could it be but Messrs. *Gelston* and *Schenck*, who voluntarily made the seizure upon some observation or knowledge of their own? It is in proof that the ship was seized by the one, under the written directions of the other. Some person must have given information to the government; some person must have set on foot the prosecution; and, in the absence of any other proof, which the defendants omitted to furnish, the necessary intendment is, that the same persons who seized the ship were the persons who gave the information. We cannot trace the information to any other source, and we are not bound to enter the land of dreams for shadowy beings, when we have before us the very persons who made the seizure, who possessed all the knowledge that the case afforded, and upon whose seizure, as the libel admits, the whole prosecution was grounded. The law looks no further than to the immediate cause of an act; *non remota, causa sed proxima spectatur*. We have a right, then, to consider *Gelston* and *Schenck* as the informers, and as being parties in interest to the prosecution carried on at their instance in the name of the *United States*.

But if they were not the informers, they were, in effect, by virtue of their office, and act of seizure, privies to the prosecution. They seized in the character of officers of the customs, and as assumed agents of the government of the *United States*. A decision against the principal binds his agent, and the agent must look to the principal for indemnity. *Scaccia*, in his book *de Sententia et Re Judicata*, in a passage cited by Mr. *Hargrave* in his *Law Tracts*, p. 483., after stating the general rule, that

IN ERROR.
......
ALBANY,
February, 1816.
GEDSTON
v.
HOYT.

*res inter alios acta aliis nec prodest nec nocet,* gives this excep-
tion to it, *sententia lata cum eo cujus principaliter interest, et a
quo alii jus habent consecutivum, facit jus quoad omnes, etiam non
intervenientes et non citatos.* There is a close intimacy and
sympathy, flowing from the law, between the officers of the cus-
toms and the government; and it might as well be pretended,
that if the seizure had been made by the secretary of the trea-
sury, a decision against the *United States* would not have bound
him. By the acts of congress, (*Laws of U. States,* vol. 1. 74.
vol. 4. 427. sect. 89.,) all penalties and forfeitures incurred un-
der the revenue laws are to be sued for in the name of the *Uni-
ted States,* by the attorney for the district; and the collector of
the customs is to cause suits to be prosecuted for all forfeitures
under the revenue laws, and to receive and distribute the
penalties when collected. It is also made the duty (*Laws of
U. States,* vol. 4. 390.) of the officers of the customs to seize
all vessels liable to seizure under any revenue law. This case
does not, indeed, come strictly within the provision of these
laws, but it would be acting against the truth of the fact, as well
as against the justice of the case, to regard these defendants as
*strangers* to a prosecution carried on by the *United States* un-
der a seizure made by them as officers of the customs. Most
undoubtedly they are to be regarded as agents of the govern-
ment in the whole of the transaction, and upon all the princi-
ples of justice, they ought to be concluded by a decision against
that very government in whose behalf they seized, and instituted
the suit. The government itself cannot be sued. There is no
remedy but against its public officers. And if they, clothing
themselves with the powers of the government to commit a tres-
pass, are not to be bound by a decision against the government,
and that too in a prosecution brought at their instigation, indi-
viduals would contend upon most unequal terms.

It would operate most injuriously to the plaintiff below, if the
acquittal of his vessel, in the district court, was not to be held
conclusive, on the question of forfeiture, in all other courts.
Let us pursue this point to its practical consequences. Sup-
pose the supreme court, in this case, had admitted, as a legal
justification, the matter set up as a defence, and had held, in
opposition to the decree of the district court, that the vessel was
lawfully seized, and justly liable to forfeiture under the laws of
the *United States.* What then ? It is certain that such a deci-

sion could not work a forfeiture of the ship; for no other court but the district court has authority to condemn. The only effect of such a decision would be to deprive *Hoyt* of his remedy for the seizure and detention of his vessel. He and his vessel are to be deemed innocent as respects the *United States*, but guilty as respects the officer who seized. His property is fairly acquitted by the only court that has authority to try and condemn. The government, in whose name, and on whose behalf it was seized and libelled, acquiesces in the justness of the sentence, and files no appeal. But when he attempts to sue the officer who did him the injury, a state court, which has no jurisdiction over the question of forfeiture, declares in favour of the lawfulness of the seizure, and right of forfeiture, and thus deprives him of all redress. Can it be possible that a doctrine leading to such absurd results, to such inextricable confusion, is well founded?

Without entering into a large field of inquiry, I apprehend it can be easily and satisfactorily shown that this is not the rule of law.

The case of *Scott* v. *Shearman* (2 *Wm. Black.* 977.) arose in the *English* court of C. B. in 1775. The case was cited and relied upon in the supreme court. It was an action of trespass against custom-house officers for entering the plaintiff's house and seizing his goods. The defendants gave in evidence, by way of justification, a condemnation of those goods in the Exchequer. The cause was twice argued, and underwent great examination. It was then contended, as it has been here, that the condemnation was only conclusive *in rem*, or on the point of forfeiture of the goods, but not in a collateral action, if the owner could prove that the goods were, in fact, not seizable, and had sued the officers seizing for damages. But the court unanimously held, that the sentence of condemnation was conclusive upon the action, and gave judgment accordingly.

There can be no doubt that this decision is a declaration of the established *English* law, and that it was so when our constitution was made. When Lord Ch. J. *De Grey* gave to the house of Lords, in the *Dutchess of Kingston's Case*, the opinion of the judges on the effect of a sentence in the ecclesiastical courts, in bar of a criminal prosecution, he certainly did not mean to touch the authority, or correctness of this decision, which he had pronounced the year before. This is still more

evident when we advert to the fact, that two years after the trial of the *Dutchess of Kingston*, he said, (2 *Bl. Rep.* 1174.,) the determination in this cause, that a condemnation of goods in the exchequer was conclusive against all the world, had been the uniform law for above a century. And many years afterwards, we find Lord *Kenyon* (7 *Term Rep.* 696.) declaring, that the same rule had been deemed settled in the early part of Lord *Mansfield's* time, and that he always acted upon it.

IN ERROR.
......
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

The law, then, is to be considered as settled, clearly, uniformly, and definitely, that if goods be seized by a customhouse officer, and are libelled, tried, and *condemned* in the exchequer, district, or other court having cognizance of the forfeiture, and the seizing officer be afterwards sued in trespass for taking the goods, he may plead that condemnation in bar of the action. So far we have proceeded with perfect assurance. The next question, then, is, suppose the goods to be seized, tried, and *acquitted* in the district court, and the officer be then sued for seizing the goods, can the officer contest the legality of the seizure over again, or cannot the owner, in his turn, set up the sentence of acquittal as a bar to that inquiry ? This is the very point and pith of the controversy, and I entertain no doubt, it is equally well settled as the other ; and that if the condemnation is a bar to the action on the one hand, the acquittal is a bar to the defence on the other. It would be monstrously unjust, and repugnant to all principle, if the rule were not so. Ought not the parties to be placed upon equal ground ; and if the sentence of condemnation be conclusive in favour of the seizing officer, ought not the sentence of acquittal to be conclusive against him ? The most obvious dictates of justice will teach every man of common understanding, that the rule, to be just, should be equal and impartial in its operation. In the opinion delivered, in behalf of all the judges, in the case of the *Dutchess of Kingston*, to which I have already referred, and to which I again allude, with the more satisfaction, because it is not only of great authority, but was very much relied on by the learned counsel for the plaintiffs in error, Lord Ch. J. *De Grey*, lays down this important maxim, that " the rule of evidence must be, as it is often declared to be, reciprocal, and that in all cases in which sentences favourable to the party are to be admitted as conclusive evidence for him, the sentences, if

*IN ERROR.*
........
ALBANY,
February. 1816.

GELSTON
v.
HOYT.

unfavourable, are, in like manner, conclusive evidence against him."

After a principle is so clearly laid down, and is, in itself, so eminently just, we hardly stand in need of cases to illustrate it. But we have a case, as early as 1716, before Baron *Price,* precisely to the point. (12 *Viner,* 95. A. b. 22. 1.) It was an action of trover, for a parcel of brandy which had been seized on some alleged breach of the revenue laws; and on an information in the exchequer, in the name of the attorney-general, the party and his property were acquitted. The sentence of acquittal was given in evidence, in the trover suit; and, on the other side, evidence was offered against the sentence, and to let in the parties to contest the fact of forfeiture over again, notwithstanding the trial and decision in the exchequer. But the evidence was rejected, and the decision of acquittal held binding.

I entertain no doubt, that this decision has been considered as good and settled law ever since it was made. It was cited as uncontradicted law, by Mr. Justice *Blackstone,* in the elaborate opinion he gave in the case of *Scott* v. *Shearman,* already referred to; and in *Cook* v. *Sholl,* which came before the K. B. in 1793, Lord *Kenyon* said, he conceived that the judgment of acquittal in the exchequer, being a judgment *in rem,* was conclusive in the subsequent action of trover, as to the question of the illegality of the seizure. The whole court of K. B. were, at once, of that opinion, and so determined the cause; but on a subsequent day, one of the counsel said that point was not so clear, for that there was a distinction as to the effect of a judgment of acquittal, or of condemnation, in the exchequer, and he referred to a passage in *Buller's N. P.,* 245., in support of his distinction. But the court never reconsidered this point, for the cause went off on other grounds.

We have, then, the decision before Baron *Price,* as long as a century ago; we have that case cited in 1775, as good law, by Sir *Wm. Blackstone,* and we have the decision of the K B. in 1793, on the same point. In opposition to all this authority, there is nothing to be cited but a passage in *Buller's N. P.,* without any adjudged case to support it; and when we come to examine the passage, we must be satisfied it cannot have been intended to apply to a proceeding *in rem.* The reason assigned in *Buller's N. P.,* why an acquittal is not conclusive in a collateral action, as well as a condemnation, is that *an acquittal ascertains no fact as a*

IN ERROR.
........
ALBANY,
February, 1818,

GELSTON
v.
HOYT,

*conviction does.* This is the reason assigned. Thus, it is said, if a party be indicted for bigamy, and convicted, it must have been a full proof that he was twice married, and could not have been on any other ground; but if he was acquitted, it might have been because he had reason to believe his first wife was dead, though she was not dead; or it might have been for many other reasons, without supposing the second to have been a lawful marriage. All this may be true in that and like cases, but in a case in the exchequer, where the goods are themselves seized and libelled as being forfeited to the government, and which is termed a proceeding *in rem*, the question of forfeiture is the only question that can be made, and a decree of acquittal does ascertain the fact that they were not forfeited, with as much certainty as a decree of condemnation ascertains the fact that they were forfeited. Indeed, in the next preceding page in *Buller*, (p. 244.,) an adjudged case is given, which completely overturns his distinction. It is the case of *Lane* v. *Degberg*, decided in 11 *W.* III., prior to the decision before Baron *Price*. It was an action by a soldier against his officer for an assault and battery. The officer justified the act as done in the army for disobedience, and gave in evidence the sentence of a council of war, founded on a petition of the plaintiff against him, and the acquittal, being the sentence of a court of exclusive jurisdiction in a case arising under martial law, was held to be conclusive evidence for the officer in the action for the assault and battery. Lord *Thurlow*, who acted as attorney-general on the trial of the *Dutchess of Kingston*, cited this case as good law; and it appears to me that, in all the learned and profound discussions to which the *Dutchess of Kingston's* case gave rise, it was never controverted, but was a conceded point, that a sentence *in rem*, pronounced by a court of peculiar and exclusive jurisdiction, was, as to the question of rightful seizure or forfeiture of the property in controversy, binding and conclusive upon all mankind.

But admitting that the decision in the district court was not binding, and the right of seizure was to be tried over again, I am, then, of opinion, on the merits, that the plaintiff's ship was never armed and equipped with any intent contrary to the act of congress.

I am persuaded the plaintiffs in error have no faith in the soundness of their position. If they had, why did they not procure an appeal from the decision of the district court? The

IN ERROR.
......
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

whole proceeding was, doubtless, very much under their controul, and their agency would have been as effectual for this purpose, as it was originally in the institution of the suit. The government itself has no confidence in this ground, or it would never have suffered so important a question to have slept quietly under the decision of a single judge.

The prohibition was against fitting out any vessel to be employed " in the service of any foreign prince or state," against " another foreign prince or state with whom the *United States* were at peace." The evidence offered was, that the ship was fitting out to be employed in the service of *Petion* against the government of *Christophe*.

It is a well-known fact, that the part of the island of *St. Domingo* under the government of those chiefs was, at the commencement of the *French* revolution, a colony of *France*, and that the authority of *France* was afterwards destroyed by the insurrection of the blacks. It is equally notorious, that *France* never renounced her claim to dominion over that colony ; and, in 1801, she sent a fleet and army to subdue it.

It may also be stated, as a further fact, resting on the same public notoriety, that the government of the *United States* have never, by any public act whatever, recognised either *Petion* or *Christophe*, or any other prince, or emperor, in *St. Domingo*, as independent powers, with whom the customary relations of peace and amity were to be maintained. The act of congress of the 28th of *February*, 1806, which I believe was cited upon the argument, is decisive evidence of the sense of the government. It prohibited all commercial intercourse between the *United States* and any person, or persons, resident within any part of the island of *St. Domingo* not in possession, and under the acknowledged government of *France*. At that time all the *Spanish* part of *St. Domingo* had been ceded to *France*, so that the act was made on purpose to apply to every part of the island which might be considered, by *France*, as in rebellion. We have no concern, at present, with the policy of this statute. It is sufficient that it shows the unequivocal sense of the administration ; and my position is, that it belongs to the government, and not to the courts of justice, to determine our foreign relations ; and, especially, to determine the time when the recognition of new states is called for upon principles of national policy.

The act of congress of 1794, under which the seizure was

IN ERROR.
........
ALBANY,
February, 1816.

GELSTON
V.
HOYT.

made, did not relate, when it was passed, to the independent governments in *St. Domingo;* for they did not then exist; and when they do exist, so as to come within the purview of the law, as " foreign princes, or states, with whom we are at peace," must depend upon the pleasure and the solemn act of the government itself.

It is a very strange and novel doctrine, that it belongs to the municipal courts to anticipate the views, and distract the policy of the government, by being the first to acknowledge new states, as they may successively arise in the revolutions of the world. There never could be more unfit organs for this purpose. The courts are, by their very constitution, passive and tranquil, and devoted to the administration of domestic justice. They have no concern with foreign intercourse, and no knowledge of the secret springs and complicated policies of nations. Among all the volumes on public law, not a passage is to be found which bestows such a function upon the judicial power; and as often as the question has arisen in the discussions on private right, the judges have uniformly disclaimed the authority.

In the case of *The City of Berne* v. *The Bank of England,* which came before Lord *Eldon* in 1804, (9 *Vesey,* 347.,) a motion was made to restrain the bank from permitting a transfer of certain funds belonging to the old government of *Berne,* before the conquest and revolution of *Switzerland,* by the acts and arms of *France.* The motion was objected to on the ground that the existing government of *Switzerland,* not being acknowledged by the government of *England,* could not be noticed by the court. The chancellor denied the motion, for the reason that a judicial court cannot take notice of a government never recognised by the government of the country in which the court sits. The same point came before the lords commissioners of appeals in prize causes, in *March,* 1808, and they decided, that *St. Domingo* was still, in point of law, under the dominion of *France,* and to be considered an enemy's colony ; and that the courts could not undertake to determine otherwise, as it had not been otherwise declared by the government. This decision of the lords commissioners was referred to by Sir *Wm. Scott,* in the case of the *Manilla,* (1 *Edw. Adm. Rep.* 1.,) and he considered it as most undoubtedly correct.

These are decisions of the highest authority in *England;* and we have a similar decision of the highest authority in this country.

In *Rose v. Himely*, (4 *Cranch*, 241.,) it was declared by the supreme court of the *United States*, that it was for governments to decide whether they could consider *St. Domingo* as an independent nation; and until such decision should be made, or *France* should relinquish her claim, courts of justice must consider the ancient state of things as remaining unaltered, and the sovereign power of *France* over that colony as still subsisting. It was said upon the argument, that this was to be considered as the *dictum* of the chief justice, and not the opinion of the court, on a point arising in the cause. But I apprehend this to be a mistake. The chief justice, in giving the opinion, observed, that the relative situation of *St. Domingo* and *France* came necessarily to be considered; and if so, the decision of that point was materially involved in the judgment of the court. And while, on this case, it is worthy of notice, that the decision here, and the decision before the lords commissioners of appeals, were remarkably coincident in point of time, as both were made within the same month, and without any possible influence of the one upon the other.

It appears to me, then, that this great turning point on the merits of this case, is equally well supported by reason and authority; and it is not in my power to entertain any doubt as to what ought to be our conclusion.

I am, accordingly, of opinion that the judgment of the supreme court ought to be affirmed.(*a*)

*(a)* At the conclusion of his opinion, his Honour, in answer to the argument of the counsel for the plaintiffs in error, drawn from the present state of the governments of *St. Domingo*, made the following observations:

It has been urged, by the counsel here, that the governments in *St. Domingo* were, in fact, and of right, independent; that they were administered with wisdom, and entitled to be acknowledged by us as independent states. I might, perhaps, be deemed wanting in attention to the learned counsel, if I passed over in silence these observations, which, however, I think would have been more suitably addressed to the government than to us. The courts have no business with the question how far, and when, it becomes proper to acknowledge a foreign power. It is a matter of policy, and not of legal obligation. The simple fact of the recent erection of an independent state cannot form, of itself, and without reference to other views and considerations, a sufficient basis on which government can act. Nothing can be more transient, as the experience of this age has taught us, than newly-erected powers in revolutionary times, or in the turbulent state of the *European* colonies. They must give evidence of stability before they can command confidence. When the act of congress was passed in 1806, disclaiming all countenance of the rebellious powers in *St. Domingo*, it was

*IN ERROR.*
......
ALBANY,
February, 1816.

GELSTON
v.
HOYT.
*April 1st.*

This being the unanimous opinion of the court, [two of the senators only being absent,] it was, thereupon, ORDERED and AD

well known to the government, that *Dessalines*, under the title of Emperor, was then reigning as absolute master over nearly the whole island. But I am very far from meaning to cast any blame upon our government for its reserve in respect to those powers ; for in what age or nation do we meet with a more rapid succession of revolution than this same ill-fated island has been doomed to experience ?

Without noticing the convulsions which agitated the island for the first ten years, which opened a civil war of extraordinary violence, and which threatened to destroy the last vestiges of civilization, if not to exterminate the inhabitants, we find that, by the year 1801, *Touissant* had recalled the laws of justice, and assumed and consolidated a peaceable authority. He had subdued *Rigaud* and other brigands. He had besieged and taken the city of *St. Domingo*, and broken up the last asylum of *French* dominion. He had established a wise and liberal constitution, and became the protector of the whites, and the encourager of our *American* trade. This *Black* Prince was a man of good sense, probity, and virtue ; and he imparted consolation to his subjects for the horrors they had witnessed, and the miseries they had endured, by a reign of prosperity and justice, moderation and glory. But the scene was as fleeting as it was brilliant. After the arrival of the *French* army, under *Le Clerc*, in 1802, he was perfidiously kidnapped, and sent, loaded with chains, to *France*, where he was suffered to languish and expire in the horrors of a dungeon. The blacks soon took ample vengeance on their enemies. The *French* army was wasted by incessant warfare and by pestilence, and the remains of it escaped from the island in 1803, by a voluntary surrender to the *English*. The independence of the blacks was then re-assumed, and *Dessalines* became their ruler, under the title of Emperor of *Hayti*. His reign was one career of rapacity, lust, and cruelty ; and he fell, in 1806, by assassination, provoked by the overruling principle of self-preservation, and the impulse of universal indignation at the monster. His repeated massacres of the whites had been quietly endured, but like *Domitian*,

———"*Periit, postquam cerdonibus esse timendus*
*Cæperat ; hoc nocuit Lamiarum cæde madenti.*"

His successors were the rival chiefs *Christophe* and *Petion*, who soon divided the empire between them ; and, from that time to this day, they have carried on a fierce and implacable war against each other. Nearly all the white, and, perhaps, three-fourths of the black population which existed in 1789, perished in these revolutions ; and the fury of the human passions has converted one of the finest and most fertile islands on the face of the globe, into a region fruitful only in crimes, and frightful with desolation.

Such is the sad story of these independent powers in *St. Domingo.* What future destiny awaits them, no mortal eye can foresee. The prospect is, indeed, a little cheered by some wise measures lately proceeding from one of these chiefs. But, at present, I think we must all concur in opinion, that the recognition of these powers, by the *United States*, is a question of seri-

IN ERROR.
•••••••
ALBANY,
February, 1816.

GELSTON
v.
HOYT.

*April 3d.*

JUDGED, That the judgment of the supreme court be, and the same is, hereby affirmed; and that the defendant recover against the plaintiffs his *double costs* for his defence of the said writ of error, to be taxed; and that the record of proceedings be remitted to the supreme court, to the end that this judgment be executed.(*a*)

A motion was made by the defendant in error for *interest* on the judgment, to be taxed, by way of damages, under the 13th section of the *act concerning costs*.

*Per totam Curiam.* The allowance of interest on the judgment of affirmance, by way of damages, rests in the discretion of the court, and where the cause of action, in the court below, was a *tort*, it is not in the course to allow interest. Interest is, therefore, denied; but double costs are allowed to the defendant, under the 14th section of the act.

ous and complicated policy, requiring, at all times, the utmost consideration and discretion in the government, and very unfit to be decided, at any time, by the courts of justice.

(*a*) A writ of error was brought on the above judgment, from the supreme court of the *United States*, which was presented to this court after the transcript of the proceedings had been sent back to the court below; and the following return to the writ of error was made by this court. " State of *New-York*, ss. The president of the senate, the senators, chancellor, and judges of the supreme court, in the court for the trial of impeachments and the correction of errors, certify, and return to the supreme court of the *United States*, that before the coming of their writ of error, the transcript of the record in the cause, in the said writ of error mentioned, together with the judgment of this court thereon, and all things touching the same, were duly remitted, in pursuance of the statute, instituting this court, into the supreme court of judicature of this state, to the end, that further proceedings might be thereupon had, as well for execution as otherwise, as might be agreeable to law and justice; and in which supreme court of judicature, the said judgment, and all other proceedings in the said suit, now remain of record; and as the same are no longer before, or within the cognizance of this court, this court is unable to make any other, or further return to the said writ. All which is humbly submitted."

In *May* term, application was made to the supreme court, by the plaintiff below, for leave to take out an execution on the judgment, the *remittitur* from the court of errors having been filed with the clerk of the supreme court; a motion was, at the same time, made, on the part of the defendant below, for leave to annex the transcript of the record to the writ of error from the supreme court of the *United States*; but no decision was made on the subject, the counsel for the parties agreeing that the transcript of the record should be annexed to the writ of error, so that the cause might be carried up to the supreme court of the *United States*, reserving the question as to the regularity or propriety of the proceeding, to be determined by that court.