Neither the county judge, nor the justices of the Supreme Court, who heard this case upon appeal, concurred in the position of the relators, that the act of the legislature under which the proceeding was instituted was repugnant to the constitution. If it were true that a citizen *Page 218 
might be deprived of the title to his own land, or of the possession of it, on the pretence that it was Indian land and that he was an intruder, without an opportunity of contesting that allegation before a jury, according to the course of the common law, I should not hesitate to declare that the act was a violation of the provision which guarantees a trial by jury in all cases in which it has been heretofore used. But such a consequence could never follow from the legal operation of the act. The Indian reservations were well defined and notorious portions of the territory of the state. It was the dictate of a prudent and just policy to guard the Indians from the injurious consequence likely to arise from the intrusion of the white population into the reserved districts in which they resided. Hence a peculiar jurisdiction was given to the local magistrate, to hear complaints of intrusions into these districts and to issue summary process for the expulsion of the intruders. Under the first section of the act, which it is alone necessary to examine, there was to be no conviction for an offence and no punishment; and no judgment, moreover, of a civil nature. The intruder was simply to be removed from a place where he could not possibly have any legal right to be. It is suggested that a citizen living upon his own farm might be ejected from it, under this act, upon the pretence that it was within an Indian reservation, and that this question might be determined against him in a summary proceeding; but the magistrate would be wholly without jurisdiction unless the place from which the party was removed was land owned or occupied by an Indian tribe. It is not a case in which he could acquire jurisdiction by his own determination of the fact upon which that jurisdiction depended. No person could be subject to proceedings under the act unless he resided upon Indian lands. This case, perhaps, shows that the question, whether a particular locality is within an Indian reservation, is not so plain a proposition as the legislature supposed. Ordinarily, the fact would be quite notorious and could not be easily *Page 219 
mistaken; but where the question is, as in this case, whether the Indian title had been extinguished, it may turn upon difficult points of law. But this would be no reason for holding that the magistrate would be justified in applying the act to a case for which it was not designed. Public officers are often obliged to act upon their own judgment in cases in which a mistake would subject them to liability. I have not overlooked the cases in which it has been held that the determination of a magistrate upon a question of fact, upon which his jurisdiction in the particular case depends, is conclusive. (Brittain v.Kinnaird, 1 Brod. Bing., 432; Gray v. Cookson, 16East, 13; Cow. Hill's Notes, 1016 to 1023.) But the principle of these cases does not apply where, as in the case before us, the inquiry is to be ex parte. In Welch v. Nash
(8 East, 394), the magistrates were authorized to make an order to stop up an existing road where a new one in the same general direction had been made, and they made such an order in a case where there was no such new road. It was held void for the want of jurisdiction. Lord ELLENBOROUGH said: "The justices cannot make facts, by their determination, in order to give to themselves jurisdiction contrary to the truth of the case;" and LAWRENCE, J., declared that the justices could not "give themselves jurisdiction in a particular case by finding that as fact which is not a fact." When this case was referred to inGray v. Cookson, the court distinguished it by saying it was an order of justices, and not a conviction. The same answer was given to the case in Brittain v. Kinnaird, where it was said that the order in Welch v. Nash was an ex parte order, in no way resembling a conviction, where the matter is investigated on oath in the presence of both parties. BURROUGHS, J., said that, in Welch v. Nash, the order was made on hearing the evidence on one side only. (Suydam v. Keys, 13 John., 444.) In my opinion, the proceeding contemplated by the act of 1821 isex parte. There is no provision for summoning the persons complained of; on the *Page 220 
contrary, the warrant is to be issued on the complaint and proof offered by the district attorney. The proceeding is, in its theory, a police regulation for preserving the Indian reservation from the intrusion of the white people. It would have been competent for the legislature to charge the sheriff of the county, or the colonel of the nearest regiment of the militia, with the duty of seeing that the Indians were not intruded upon, and of removing all white persons found on their lands. Instead of this, a prima facie case is required to be made out, on anex parte hearing, and a judge's warrant to be obtained, to the end that the matter shall assume a more orderly form, and that breaches of the peace may be avoided. Still, the system is provided solely for cases of a residence upon Indian territory; and should it be applied to other cases, the magistrate would be held to have acted without jurisdiction, and the party affected would have his redress, as in other cases of wrongs done without authority but under color of law. These are my conclusions upon the argument of the counsel for the relators, designed to prove the act of 1821 unconstitutional In the view which I have taken of the other questions, it would be unnecessary to pass upon the validity of the act; but, as the point was much pressed, and is of some public importance, I have thought it proper to express an opinion upon it.
The material question in the case, then, is, whether the Indian title to the Tonawanda reservation had been extinguished when this complaint was preferred. The county judge decided that it had not. He was of opinion that the territory in question continued to be Indian lands, within the meaning of the act, until the distribution of the money paid for the Indian improvements had been awarded among the individual Indians entitled thereto, according to the provisions of the treaty; and that such an award had not been legally made, because, as he held, the appointment of Mr. Gay as an arbitrator was unauthorized and his acts in that character void. The Supreme Court did not enter upon *Page 221 
that question, but affirmed the order of the county judge, on the ground that, although the Indian title might have been extinguished in favor of Messrs. Ogden and Fellows, the act of 1821 remained applicable to the tract of land comprising the reservation, while the Indians remained in possession, though they were holding against right. These questions are now to be considered, together with the further one, whether it was competent for the district attorney to impeach the transaction between the Seneca nation of Indians and Ogden and Fellows, on the allegation that the chiefs and warriors acting on behalf of the nation had not authority to do what they assumed to do, or on the allegation that the treaties were brought about by the practice of bribery and corruption on the part of the agents of Ogden and Fellows.
First. The government of the United States has always regarded the Indian nations or tribes as distinct communities, between which and our government certain international relations were to be maintained. They have, it is true, been denied to be foreign nations, within the meaning of the constitution; and it is clear, from the whole tenor of our legislation respecting them, as well as from their residence within our territorial boundaries, that they are in no sense independent nations. (The Cherokee Nation
v. The State of Georgia, 5 Peters, 1; Worcester v. TheState of Georgia, 6 id., 515; Jackson v. Goodell, 20John., 693; Strong v. Waterman, 11 Paige, 607.) Still, both the legislative and judicial branches of the national government have maintained, in the most emphatic manner, that the Indian tribes possess such a national character as to be within the provisions of the constitution empowering the president to make treaties with them, by and with the advice and consent of the senate. The treaties and compacts between the United States and the Indian nations, concluded by virtue of this provision of the constitution, fill a large volume of the late collection of laws and treaties. (Statutes at Large, vol. 7.) The twelfth section of the act of congress for regulating trade and intercourse *Page 222 
with the Indian tribes, passed in 1802, declares that no purchase of lands made from any Indian or any Indian tribe or nation within the United States "shall be of any validity in law or equity, unless the same be made by treaty or convention, entered into pursuant to the constitution." (2 Story's Laws, 841.) InWorcester v. The State of Georgia, just referred to, the decision of the Supreme Court of the United States is based principally upon the ground that the judgment under review, which was reversed, was contrary to the effect of certain treaties between the United States and the Cherokee nation of Indians.
I shall, therefore, assume that the treaties which were given in evidence before the county judge, in this case, belong to the class of instruments of that name referred to in the constitution, and that they are consequently a part of the supreme law of the land. Probably no one would deny that effect to any stipulation of a public character contained in them. The cession in favor of Ogden and Fellows is, in the main, an arrangement looking to private interests. It was, however, public and national, as regards the United States, because a public law had forbidden a private arrangement on the subject of such purchases, and had required that such a transaction should always constitute a provision of a public treaty. I am aware that it has been held, by the Supreme Court of this state, that the Indian intercourse act of 1802 does not apply to purchases from individual Indians of their bounty lands patented to them by the state; and that a doubt was expressed by Chief Justice NELSON whether the power to regulate commerce with the Indian tribes, conferred upon congress by the eighth section of the first article of the constitution, extended even to sales of Indian lands owned by the tribes. (Murray v. Wooden, 17 Wend.,
531.) I do not participate in that doubt; but am of opinion that the twelfth section of the intercourse act was well warranted by the constitutional provision referred to. The term commerce, in the connection in which it stands in *Page 223 
that provision, may properly apply to all transactions, respecting money or property, between an Indian tribe and the white citizens of the Union. It does not apply, in terms or in spirit, to dealings with an individual Indian concerning lands which he holds in severalty under the laws of the state, as was correctly decided in Murray v. Wooden. If I felt less confident than I do in this position, I should be very reluctant to set aside the settled policy of the government upon this subject, which has been acted upon and acquiesced in for more than fifty years. Besides, should it be conceded that, notwithstanding the twelfth section of the intercourse act, individuals or states might, by private arrangement, purchase Indian lands, the purchase of the Tonawanda reservation, in question in this case, was in fact one of the terms of a treaty between the United States and the Indian nation. The private purchase was enveloped in that treaty, and partook of its national character and its legal authenticity. It was, it is conceded, in most of its aspects, as regarded the purchasers, a private arrangement; but yet it affected the interests and well-being of a distinct though dependent community, living within the jurisdiction of the United States and under their protection. Public considerations were thus mixed up with the private transfer, and the whole subject, independently of the provisions of the intercourse act, was one very proper to be provided for in a treaty between the United States and the Indian nation. When, therefore, it is found to be one of the stipulations of such a treaty, we are bound by the constitution to yield to it the same conclusive effect which belongs to other provisions of treaties.
The compacts under consideration have been ratified by the senate and proclaimed and published by the President of the United States. We cannot question the authority under which they were negotiated, or entertain an issue touching their fairness. We are bound to regard the lands assumed to have been sold as the property of the purchaser, and to consider the relation which the Indian nation sustains towards *Page 224 
such lands and towards the government to be precisely such as the treaty has established. This would be so, very plainly, upon principle and the reason of the thing; and the doctrine is well established by authority. The relations which other nations and communities hold towards the United States are such as the political government of the Union has established; and the courts receive the action of the government upon such subjects as the rule of their decision. (United States v. Palmer, 3 Wheat.,
610, 634; 4 id., 65, note a, 1; Gelston v. Hoyt, 3 id.,
246, 324; S.C. in the Court of Errors in New-York, 13 John.,
561; Foster v. Neilson, 2 Peters, 307; United States v.Arredondo, 6 id., 691, 710; Ware v. Hylton, 3 Dallas,
199.)
Second. The distinction upon which the Supreme Court disposed of this case cannot be sustained. The judges of that court held that, although the Indian title to the reservation had been extinguished, and the legal and beneficial ownership of the land vested in Ogden and Fellows, yet, as the Indians remained in possession of the reservation, the act of 1821 is still operative, and the grantees of Ogden and Fellows can be turned out of possession under its provisions. It should be remembered that the relators, so far as the evidence discloses, entered peaceably; that they are in possession of their farms under a claim of ownership, and that these farms form a part of a settlement of white people occupying contiguous territory, and all holding under the title of Ogden and Fellows. The Indians, it is true, occupy the remainder of the reservation; but as to the farms of the relators, and the other portions of the white settlement, the actual possession is not in the Indians but in the white settlers. The relators have been in possession several years, have built houses and inclosed their possessions with fences, and, in connection with the other white inhabitants, have submitted to the local laws which prevail in towns unconnected with Indian lands, those laws having been extended over them. I do not say that these circumstances would afford a defence *Page 225 
against a complaint under the act, if the original entry and the subsequent occupation had been by wrong; but if it be assumed that the Indian title had been extinguished or transferred to Ogden and Fellows, and that the alleged intruders entered and held under those persons, being the rightful owners of the land, the statute has no application whatever to their case. Their possessions are not lands belonging to or occupied by a nation or tribe of Indians. They do not belong to the Indian nation, for the nation has sold them to Ogden and Fellows. They are not occupied by the Indian nation or by Indians, for it is admitted that the relators are in possession of them. The Indians, it is true, claim to own these premises, and they occupy adjoining lands on the same tract; but their claim, being an unfounded one, does not give them a constructive possession beyond their actual occupation. It was noticed on the argument that the act speaks of "lands belonging to or occupied by any nation or tribe of Indians," from which it was inferred that if an Indian tribe had been in possession, as a trespasser, of lands belonging to others, it would still have been entitled to the aid of the act to remove intruders, or even the rightful owner, if he should enter. It is probable that the phraseology referred to was used in order to embrace the Indian reservations, whether their title should be considered an ownership, or a right of occupancy of land, the fee of which was in the state, as the grantees of the right of preëmption. It would be an unreasonable construction to hold that an Indian tribe might take possession of land belonging to a person not an Indian, and if that person should seek to occupy his own land, that he should be liable to be turned out under this act; and it is scarcely less unreasonable to assert that, after a tribe of Indians had sold and conveyed its lands in a manner authorized by law, the purchaser, entering without force and occupying for several years without interruption, should be liable to be removed as an unlawful intruder. Again, if it be conceded that Ogden and *Page 226 
Fellows acquired the title to the Tonawanda reservation by the terms of the treaty, a state law forbidding them to enter and providing for their expulsion would be void for repugnancy to the treaty. The value of property consists in the right to possess and enjoy it. This is the only notion we have of property. Such a right is incompatible with the power residing in another party to prevent such enjoyment. If Ogden and Fellows own this land by virtue of the treaty, their title is founded upon the supreme law of the Union, which controls the constitutions and laws of the respective states and cannot be controlled by them. Where a repugnancy exists between a treaty or a law of the United States, upon a subject within the constitutional powers of the president and senate, or of congress, and a state law, the former must control and the latter must yield. (McCullough v. The State ofMaryland, 4 Wheat., 426.)
Third. The ground upon which the county judge decided the case remains to be considered. By the latter clause of the fourth article of the indenture of 1842, it is declared that "the amount to be paid to each individual Indian" shall be determined by "the same arbitrators" who shall decide upon the amount of the consideration. One of these arbitrators resigned without performing this duty, and Mr. Gay was substituted as an arbitrator in his place, by an order of the secretary of war, and the distribution among the individual Indians was awarded by Gay and Cook. They were not the same arbitrators who had decided upon the consideration, although appointed by the same authority. Then this court has decided that an Indian who was entitled to be paid for improvements on this reservation, by the treaty under consideration, could not be deprived of his possession until the amount he was entitled to receive had been determined upon by arbitrators, according to the article of the conveyance referred to; and this judgment has been affirmed by the Supreme Court of the United States. (Blacksmith v. Fellows, 3 Seld., 401;S.C., 19 How. U.S. *Page 227 R., 366.) As to the lands of the reservation not improved by individual Indians, the provision, respecting the division of the money applicable to the payment for improvements, has no operation. The Indian title to the unimproved lands was extinguished by the treaty, the adjustment of the consideration money, the lapse of one month from the filing of the report upon that subject, and the actual payment of the money to the government to enable it to apply the same to the benefit of the Indians according to the treaty. The possession of Cutler was wholly upon unimproved lands. These lands had been purchased and paid for by the parties under whom Cutler entered. That purchase was made with the assent and by the coöperation of the proper officers of the government of the United States, and it was sanctioned by a public treaty. The purchasers had performed every condition belonging to them to perform. Cutler, as their grantee, entered peaceably upon a vacant possession, and had resided there for seven years. As to him, I am entirely confident that the act of 1821 had no rightful application. There was no authority, therefore, to issue a warrant of removal against him. The premises occupied by the Underhills were partly improved and partly unimproved lands. As to the former, the particular Indians entitled to be paid for the improvements had a right to retain their possession, provided the appointment of the substituted arbitrator was unauthorized; but as to the latter, the forest lands, the Underhills had a right to enter peaceably under Ogden and Fellows, and the judge had no right to cause them to be disturbed. In respect to the improved portions of the possession of the Underhills, they occupied them with the consent of Thomas Black, the Indian to whom the improvements belonged, and as his lessees; but Black, being an Indian, could make no contract of that nature.
This brings us to the question whether the act of 1821 is applicable to any part of the Tonawanda reservation, under the circumstances which existed when these proceedings *Page 228 
were taken. The title of the Indians as a nation or tribe had been extinguished; all the requirements of the treaty had been performed, so far as that title was concerned, and the consideration money had been paid to the government of the United States, as trustees of the Indians. As to the unimproved lands, at all events, Ogden and Fellows, and their grantees, had a right to enter and to reside upon them. As to the improved lands, the title of the tribe had become vested in Ogden and Fellows; but certain individual Indians had a lien for the money payable in respect to their improvements, and a right of possession until the distributive shares of that money had been adjusted in a particular manner. Thus situated, I am of the opinion that the reservation was no longer "lands belonging to or occupied by" a nation or tribe of Indians, within the meaning of the act. The policy upon which this statute was passed, to wit, secluding the residence of the Indians from the influence of white inhabitants, could no longer be carried out. The improved portions were interspersed among the forest lands. The latter were lawfully open to the entry of the grantees of the proprietors, and the two races were thus necessarily brought into proximity. If a white person was found occupying a parcel of improved land, and a warrant was issued for his removal, to what place should he be removed? Not necessarily off from the original reservation, as contemplated by the statute, but from the farm on which he resided. If the adjoining premises were a parcel of land which had not been improved by an Indian, he had a perfect right, so far as the public or the Indians were concerned, to reside there. The removal would not, therefore, relieve the Indians from the effects of his proximity to them. The great object of the act, the separation of the two races, had become impossible, on account of the purchase by individuals of all the common lands of the tribe. This solution of the question leaves the Indians, who are in the possession of improved lands, a perfect remedy against any attempt to intrude upon *Page 229 
them until their portion of the improvement fund shall be adjusted. It is entirely consistent with the judgment inBlacksmith v. Fellows, in which the plaintiff, who was an Indian thus circumstanced, was allowed to maintain an action against Fellows, who attempted to make a premature entry upon his improvement.
I am of the opinion that the judgment of the Supreme Court and the order of the county judge should both be reversed.
SELDEN, J., took no part in the decision
Judgment affirmed. *Page 230 
[EDITORS' NOTE: THIS PAGE IS BLANK.] *Page 231